O

NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## EASTERN DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; SAN BERNARDINO VALLEY AUDUBON SOCIETY; and FRIENDS OF THE NORTHERN SAN JACINTO VALLEY, | |
| Plaintiffs, | Case No. 5:09-cv-90 |
| v. | OPINION |
| UNITED STATES FISH & WILDLIFE SERVICE and Dirk KEMPTHORNE, Secretary of the Interior, | |
| Defendants. | |

THOMPSON, U.S.D.J.[1]

### I.   INTRODUCTION

This matter comes before the Court upon Plaintiffs' Motion for Summary Judgment [docket # 22] and Defendants' Motion for Summary Judgment [docket # 26]. The Court has decided the motions upon consideration of the parties' written submissions, without holding oral argument. For the reasons given below, Plaintiffs' motion is granted and Defendants' motion is denied.

### II.   BACKGROUND

This case concerns a challenge to a decision of the U.S. Fish & Wildlife Service ("FWS" or "the Service") made under authority of the Endangered Species Act ("ESA" or "the Act"), 16 U.S.C. § 1531 *et seq.* Congress passed the ESA in 1973 in order to provide for the conservation

---

[1] The Honorable Anne E. Thompson, United States Senior District Judge for the District of New Jersey, sitting by designation.

of species threatened with extinction and to allow the populations of such species to recover to the point where extinction is no longer a threat.  16 U.S.C. § 1531(b); *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004).  Section 4 of the Act requires the FWS to determine when a species is "threatened" or "endangered" with extinction, and such a determination triggers various statutory and regulatory protections.  *See* 16 U.S.C. §§ 1533, 1538.  When the FWS determines that a particular species is threatened or endangered, section 4 also requires it to designate a "critical habitat" for the species.  16 U.S.C. § 1533(a)(3). A federal agency contemplating an action that might adversely affect any designated critical habitat is required to participate in a consultation process designed to mitigate any harm to that habitat.  *See* 16 U.S.C. § 1536(a).  Since a vast number of land use projects require a permit from a federal agency, if a parcel of land is part of a critical habitat designation, it may become quite difficult for a public or private entity or individual to develop or exploit that land.

In 1998, the FWS designated the San Bernardino kangaroo rat ("SBKR") as an endangered species.  63 Fed. Reg. 51005 (Sep. 24, 1998).  In 2000, the FWS proposed designating 55,408 acres as critical habitat for the SBKR, and on April 23, 2002, the Service made a final designation of 33,295 acres.  67 Fed. Reg. 19812.  In 2005, building industry and agricultural organizations challenged the final designation in court, contending that it was overbroad.  The FWS settled that case by agreeing to issue a revised critical habitat designation. On June 19, 2007, the Service proposed the new, revised critical habitat designation, which reduced the SBKR's critical habitat to 9,079 acres.  On October 17, 2008, after a period of public comment on the proposed revised habitat designation, the FWS published the final revised critical habitat designation, which covered 7,779 acres.  73 Fed. Reg. 61936.

Designation of a critical habitat is a multi-step process, governed by both section 4 and section 3 of the Act.  In determining a species' critical habitat, the FWS must give effect to the

ESA's definition of that term, which is quite specific. Section 3 defines "critical habitat" to include

> (i) the specific areas within the geographical area occupied by the species, at the time it is listed . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and
>
> (ii) specific areas outside the geographical area occupied by the species at the time it is listed . . . upon a determination by the Secretary that such areas are essential for the conservation of the species.

16 U.S.C. § 1532(5)(A). "Conservation" is in turn defined as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the [protective] measures provided pursuant to [the ESA] are no longer necessary." 16 U.S.C. § 1532(3). After determining the geographic area that meets this two-pronged definition, the FWS may, under section 4(b), exclude certain portions of that area "if [it] determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless . . . the failure to designate such area as critical habitat will result in the extinction of the species concerned." 15 U.S.C. § 1533(b)(2). In sum, critical habitat designation has three relevant steps: (1) identifying those areas occupied by the species that contain the features essential to the species' survival, (2) determining if any areas unoccupied by the species are essential for the conservation of the species, and then (3) excluding from these two areas any portions where the benefits of exclusion outweigh the benefits of inclusion, so long as such exclusion will not result in the species' extinction.

The FWS's determination of a species' critical habitat is further governed by administratively-established criteria codified at 50 C.F.R. § 424.12. That regulation compels the FWS to "focus on the principal biological or physical constituent elements within the defined area that are essential to the conservation of the species." These "principal constituent elements"

3

("PCEs") must be listed with the critical habitat description. *Id.* PCEs "may include, but are not limited to, the following: roost sites, nesting grounds, spawning sites, feeding sites, seasonal wetland or dryland, water quality or quantity, host species or plant pollinator, geological formation, vegetation type, tide, and specific soil types." *Id.* Ultimately, the final designation of a species' critical habitat must "be defined by specific limits using reference points and lines as found on standard topographic maps of the area." *Id.* In summary, in making a critical habitat determination, the FWS must focus on those constituent elements that make the area essential to the conservation of the species. The final designation itself, however, must be phrased in terms of points and lines on a topographical map.

Following this procedure, the FWS gave three PCEs for the SBKR:

> (1) Alluvial fans, washes, and associated floodplain areas containing soils consisting predominately of sand, loamy sand, sandy loam, and loam, which provide burrowing habitat necessary for sheltering and rearing offspring, storing food in surface caches, and movement between occupied patches;

> (2) Upland areas adjacent to alluvial fans, washes, and associated floodplain areas containing alluvial sage scrub and chamise chaparral, with up to approximately 50 percent canopy cover providing protection from predators, while leaving bare ground and open areas necessary for foraging and movement of this subspecies; and

> (3) Upland areas adjacent to alluvial fans, washes, and associated floodplain areas, which may include marginal habitat such as alluvial sage scrub with greater than 50 percent canopy cover with patches of suitable soils (PCE 1) that support individuals for repopulation of wash areas following flood events. These areas may include agricultural lands, areas of inactive aggregate mining activities, and urban/wildland interfaces.

Administrative Record ("AR") 26684. Plaintiffs do not challenge the appropriateness of these PCEs. Instead, they contend that, despite establishing a fair set of PCEs, the Service violated the ESA and 50 C.F.R. § 424.12 in how it ultimately determined what specific geographic areas constitute the SBKR's critical habitat. Specifically, Plaintiffs challenge the FWS's decision to rely on the existence of "core populations" to determine critical habitat.

4

In the course of designating the SBKR's critical habitat, the FWS made the following determination:

> Areas that contain the physical and biological features that are essential to the conservation of this subspecies, identified as the subspecies' PCEs laid out in the appropriate quantity and spatial arrangement, are those areas capable of supporting a core population of San Bernardino kangaroo rats and providing protection against stochastic events.

AR 26675. A thorough understanding of this passage and what it reveals about the Service's reasoning is critical to the disposition of this lawsuit. As was noted above, section 3 of the ESA declares that a species' "critical habitat" consists of those geographic areas that contain "those physical or biological features . . . essential to the conservation of the species." 16 U.S.C. § 1532(5)(A). The FWS took the position that, in this case, "areas . . . where there are found those physical or biological features essential to the species' conservation" means areas containing the above-listed PCEs, but only where the PCEs are *in sufficient quantity* and *in certain spatial arrangements. See, e.g.,* AR 26675, 26681, 26684. In the absence of these special quantities and spatial arrangements, the presence of the SBKR's PCEs does not qualify an area as critical habitat. *See, e.g.,* AR 26660, 26662. Furthermore, the revised final rule does not describe what these necessary quantities or spatial arrangements are. Instead, the Service concluded that these requisite quantities and spatial arrangements will be present in any area that is capable of supporting a "core population" of SBKRs. *See, e.g.,* AR 26675, 26685. In order to determine what areas are capable of supporting a core population, the FWS reviewed data from live trappings of SBKRs that took place during recent years. *See, e.g.,* AR 26659, 26685. When the SBKR's critical habitat was ultimately defined in terms of points and lines on a map, it was drawn to cover those areas where trappings had repeatedly demonstrated the presence of a stable population of SBKRs. AR 26685 ("In this designation, we have focused primarily on core

5

populations (i.e., areas where the subspecies has been repeatedly detected through live trapping) in undisturbed habitat . . . .").

After determining the geographic areas that met this criterion, the FWS exercised its discretion under section 4(b) of the Act to exclude certain areas where it felt that the benefits of exclusion outweighed the benefits of inclusion. Specifically, it excluded 751 acres in the floodplain of the upper Santa Ana River known as the "Wooly Star Preserve Area," 267 acres of land on the former Norton Air Force Base, 1,265 acres within the Cajon Creek Habitat Conservation Management Area, 595 acres within the Western Riverside Multiple Species Habitat Conservation Plan, and 39 acres near the San Jacinto River that are within the Hemet/San Jacinto Integrated Recharge Recovery Project.

## III. ANALYSIS

In this lawsuit, Plaintiffs challenge the FWS's revised final critical habitat designation for the SBKR on three grounds. First, they contend that the FWS's use of the "core population" methodology outlined above contravenes the first prong of the ESA's definition of critical habitat—i.e., the "occupied habitat" portion (16 U.S.C. § 1532(5)(A)*(i)*)—as well as the regulation described above, 50 C.F.R. § 420.12. Second, Plaintiffs argue that the Service improperly failed to include areas unoccupied by the SBKR in the critical habitat designation. Finally, they also argue that the FWS's decisions to exclude certain portions of the species' critical habitat under the authority of section 4(b) were improperly made.

### A. Standard of Review

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). As the administrative

record constitutes the entire factual record in this case, there are no facts at issue between the parties, and the matter is ripe for summary judgment.

Judicial review of an agency action taken under the ESA is governed by section 706(2)(A) of the Administrative Procedures Act ("APA"), which provides that a "reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Vill. of False Pass v. Clark*, 733 F.2d 605, 609 (9th Cir. 1984). Review under this standard is "searching and careful" but also "narrow." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989). In recognition of the deference a court should show to the expertise of an agency, the court's role in this situation is not to "substitute its judgment for that of the agency," but rather to examine whether there is a "rational connection between the facts found and the choice made." *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687 (9th Cir. 2007) (quoting *Motor Vehicles Mfgs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The agency must provide a cogent explanation for "why it has exercised its discretion in a given manner," and the reviewing court must determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys.*, 419 U.S. 281, 285 (1974)). An agency action must be held unlawful and set aside if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* The explanation upon which the agency relies must be one that the agency itself put forward in making its decision; the explanation may not be supplied after the fact by the agency's attorney. *See Bonneville Power Admin.*, 477 F.3d at 688

(quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  A court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned . . . [but] may not infer an agency's reasoning from mere silence." *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008) (quotations omitted).

  B.  The Core Population Methodology

Plaintiffs contend that the methodology the FWS used to determine the SBKR's critical habitat runs afoul of both the statutory language of section 3 of the ESA and the regulatory language of 50 C.F.R. § 424.12.

  1.  Section 3(5)(A)(i) of the Endangered Species Act

As was outlined above, the FWS determined the SBKR's critical habitat primarily by figuring out, through live trapping, which geographical areas already supported a substantial, continual population of SBKRs.[2]  This methodology opened the Service up to overlooking "those physical or biological features . . . essential to the conservation of the species." 16 U.S.C. § 1532(5)(A)(i).  The complaint is that the FWS allowed itself to satisfy this statutory language by using a proxy criterion—the presence of a core population.  This Court's task, therefore, is to determine whether or not the approach of the FWS comports with the ESA and the APA.  After considering the administrative record, especially the text of the final rule itself, the Court concludes that the FWS's use of "core populations" appeared to be a proxy for areas "on which there are found those physical or biological features (I) essential to the conservation of the

---

[2] The reliance that the FWS placed on the core population methodology had a direct and pronounced effect on the revision of the SBKR's critical habitat. The final rule designating the revised critical habitat details the specific areas that were removed from the original 2002 designation. For each area removed, it is clear that the central reason for removing the area from the SBKR's critical habitat was "occurrence data"—i.e. trappings—that showed the absence of a core population. *See, e.g.,* AR 26676 col. 2 ("Occurrence data from these five areas also indicate that none of these areas currently support or are capable of supporting a core population in the future."); *see generally* AR 26675-77. In fact, in some instances, land was removed from the revised SBKR's critical habitat not because there was actual occurrence data showing the absence of a core population, but merely because there was no data indicating either the presence or the absence of a core population. *See, e.g.,* AR 26676 col. 3 ("[I]n the eastern most (upstream) portion of the San Jacinto River that was designated as critical habitat in 2002, *we do not have occurrence data* to indicate that the area is occupied or supports a core population . . . .") (emphasis added).

species and (II) which may require special management considerations or protection." The core population methodology is a departure from the ESA's statutory language.

On several occasions, the Ninth Circuit has upheld the use of proxy reasoning to satisfy environmental statutes such as the ESA. *See Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1017-18 (9th Cir. 2006) (collecting cases). However, it has done so only in situations where the government has shown that the proxy being used is a sound substitute for the underlying criterion. *See id.* The Ninth Circuit has described this test as a determination of whether or not the methodology being used "'reasonably ensures' that the proxy results mirror reality." *Gifford Pinchot*, 378 F3d at 1066 (quoting *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 972-73 (9th Cir. 2002)). For example, in *Gifford Pinchot*, the appeals court upheld the use of the spotted owl's habitat as a proxy for the owl's population levels because "the habitat models used [in that case] reasonably ensure that owl population projections from the habitat proxy are accurate." *Id.* In assessing whether the FWS has satisfied this test, the Court must accord proper deference to the Service's technical expertise. *Id.*

The problem with the FWS's reliance on core populations to identify areas of land "on which there are found [the requisite] physical or biological features" is that it limits the projection for needed space. Analyzing a couple of key passages from the final rule will demonstrate this. For example, in summarizing the changes from the 2002 designation to the 2008 designation, the FWS states:

> The criteria utilized for the 2002 designation identified areas that supported few occurrence records for inclusion in the designation. We have now determined, based on the best currently available information, that such areas of low density occupation (or sporadic occupancy) are not likely to contribute to the long-term conservation of this subspecies as they do not support core populations, are not capable of supporting a core population in the near future, and they provide little protection against stochastic events. Areas that contain the physical and biological features that are essential to the conservation of this subspecies, identified as the subspecies' PCEs laid out in the appropriate quantity and spatial

9

> arrangement, are those areas capable of supporting a core population of San
> Bernadino kangaroo rats and providing protection against stochastic events.

AR 26675. This passage does not indicate why the FWS believes that areas that contain the

physical and biological features essential to the SBKR's conservation are best identified as those

already supporting a core population. It also does not identify the "best available information" to

which the passage refers. In sum, the rule fails to explain what data or analysis led the FWS to

adopt the core population methodology. While this Court owes substantial deference to the

Service's use of technical analysis in its decisionmaking, the Service must be able to demonstrate

that such analysis actually took place and that the decisionmaking process may be fairly

described as rational.

Similar problems are evident in the section of the final rule entitled "Criteria Used To

Identify Critical Habitat," where the FWS states:

> In this designation, we have focused primarily on core populations (i.e., areas
> where the subspecies has been repeatedly detected through live trapping) in
> undisturbed habitat . . . that contain the physical and biological features essential
> to the conservation of the San Bernardino kangaroo rat. We believe that
> protecting the three largest core populations is essential to the survival and
> recovery of this subspecies.

AR 26685. Again, there is no explanation as to why the Service focused primarily on core

populations or what the relationship is between core populations and areas of land on which may

be found the physical or biological features essential to the SBKR's conservation. These two

quoted sections are representative of the text of the final rule as a whole. After a careful reading

of the text of the 2008 rule designating the SBKR's critical habitat, the Court has been unable to

identify any justification for the Service's decision to use the core population methodology.

In defending the FWS's use of this methodology, Defendants assert, without elaboration,

that "the Service reasonably concluded that areas with high relative abundances and fitness of

SBKR also possess high quality habitat." (Defs.' Mem. Supp. Defs.' Mot. Summ. J. 9 (citing

AR 27399).) This is, perhaps, a reasonable assumption for the FWS to make. However, this premise does not logically entail the *converse proposition*—i.e., that those areas that possess a high quality habitat will contain an abundant SBKR population. And it is this converse proposition that, if true, would justify the core population methodology.[3] In reality, the use of core population as a proxy for areas that contain the physical or biological features essential to a species' conservation will fail to identify areas that have these essential features but, for whatever reason, do not happen to support an abundant population. Consequentially, the core population methodology will frequently lead to a substantially underinclusive critical habitat designation.[4] There may, presumably, be cases where core population is a viable proxy for the physical or biological features necessary to an endangered species' conservation. However, in the absence of any data or analysis suggesting that this happens to be one of those cases, the Service cannot simply conclude that the proxy is accurate.

The failure of the core population methodology extends deeper than this, however. The 2008 final rule not only fails to give any explanation as to why the Service believes that core population is an adequate proxy for areas "on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special

---

[3] To put it another way, the passage quoted from Defendants' brief shows only that all (or most) core populations exist in a high quality habitat. To justify the core population methodology, one would have to conclude that all (or most) high quality habitats support a core population.

[4] In *Alliance for the Wild Rockies v. Lyder*—a case substantially similar to the case at bar—the U.S. District Court for the District of Montana made the same point:

> Requiring Colorado to prove a self-sustaining population before the Service will conclude it has the requisite primary constituent elements is a more stringent requirement than the ESA demands. A self-sustaining population means an area has the habitat features necessary for conservation. However, the absence of such a population only means that there is something holding the population back, which may—but not necessarily—stem from the lack of the primary constituent element. By way of example, human-caused mortalities or a lack of connectivity might be the problem, not a lack of [the relevant PCEs]. The Service is required to designate the geographical area with the features necessary to promote [recovery of the species]. By requiring proof that an area already hosts a recovered viable population before it can be designated, the Service created a metric more stringent than, and contrary to, what the ESA dictates.

Civ. No. 09-73-M-DWM, 2010 WL 3023652, at *10 (D. Mont. July 28, 2010).

management considerations or protection." The rule also fails to give an explanation of what these "physical or biological features" are in the first place. In other words, the Service does not, at any place within the sixty-six pages comprising the final rule, explain what actual physical or biological features are essential to the conservation of the SBKR. The rule makes a gesture at defining these features by stating that "the physical and biological features that are essential to the conservation of this subspecies" are "identified as the subspecies' PCEs laid out in the appropriate quantity and spatial arrangement." AR 26675. However, the rule does not hint at what "appropriate quantity" and "spatial arrangement" are supposed to mean. Therefore, the final rule does not give any explanation as to what, exactly, are "those physical or biological features essential to the conservation of the species." In light of this absence, it appears that the Service failed to follow the ESA's statutory directives in designating the SBKR's critical habitat.

Furthermore, because the Service failed to identify expressly "those physical or biological features essential to the conservation of the [SBKR]," the Court is unable to assess whether or not core population is a viable proxy in this case. Determining whether or not a particular proxy accurately reflects reality requires that the Court first identify what it is it is that the proxy is approximating. To continue the example from above, in *Gifford Pinchot*, the FWS explained that the existence of a certain quantity and quality of habitat (the proxy) could be used to predict the number of spotted owls presently living in that habitat (the underlying criterion). 378 F.3d at 1066. In this case, however, since Defendants have not explained what it is that the existence of a core population is supposed to tell us about a particular piece of land, the Court is unable to assess whether or not the proxy reasonably reflects the underlying criterion.

While the text of the final rule does not explain why the FWS failed to identify expressly the "physical or biological features essential to the conservation of the [SBKR]," defense counsel provided the Court with one possibility. In their opening brief, Defendants concede that "the

SBKR occupies varying types of habitat, and there is not enough available data at the present time to differentiate between them to determine what about a certain type of habitat supports the essential or physical biological features." (Defs.' Mem. Supp. Defs.' Mot. Summ. J. 8.)  This may be an explanation for the FWS's decision to use the core population methodology, but it does not satisfy the APA.  Lack of data does not excuse an agency from complying with statutorily-listed criteria.  The text of section 3(5)(A)(i) makes clear that critical habitat should be designated based on the presence of "those physical or biological features essential to the conservation of the species."  The Service then must directly identify what those features are.

Since the FWS did not supply an explanation for its reliance on the existence of a core population as an indicator of the "physical or biological features essential to the conservation of the species," its 2008 designation of the SBKR's critical habitat may be viewed as arbitrary and capricious, in violation of the APA.[5]

2.  50 C.F.R. § 424.12.

Alternatively, the 2008 critical habitat designation may be set aside because the core population methodology also contravenes the regulatory framework that governs the FWS's designation of critical habitat.  An agency generally must abide by its own regulations. *Confederated Tribes & Brands of Yakima Indian Nation v. FERC*, 746 F.2d 466, 474 (9th Cir. 1984).  However, a court will only enforce those regulations that have the force of law.  *W. Radio Servs. Co. v. Espy*, 79 F.3d 896, 900 (9th Cir. 1996).  To have the force of law, a regulation must be a substantive rule—not a policy statement, interpretive rule, or an agency procedure—and it must have been promulgated according to the APA's rulemaking requirements.  *United*

---

[5] At one point in their brief, Defendants characterize their reliance on core populations as a legal interpretation of the ESA to which this Court should defer under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  However, for the reasons outlined above, the phrase "areas . . . on which are found the physical or biological features essential to the conservation of the species" cannot reasonably be interpreted to mean areas that already support a core population of the species.  Therefore, *Chevron* deference is unwarranted. *See id.* at 843.

*States v. Fifty-Three Eclectus Parrots*, 685 F.2d 1131, 1136 (9th Cir. 1982). However, some regulations will be considered substantive and thus enforceable even though they appear to be procedural in nature. More specifically, when a procedural rule is designed to implement an agency's statutory obligation to the public, as is often the case with environmental regulations, it is considered to have the force of law. *See Yakima*, 746 F.2d at 474-75.

     As noted above, 50 C.F.R. § 424.12 mandates that "[w]hen considering the designation of critical habitat, the Secretary shall focus on the principal biological or physical constituent elements within the defined area that are essential to the conservation of the species." Defendants' use of the core population methodology for designating the SBKR's critical habitat indicates that the FWS did not "focus" on the species' PCEs. Rather, the FWS focused on a different criterion that it believed bore some relationship to the SBKR's PCEs. However, in the absence of any study into the relationship between the SBKR's PCEs and the presence of a core population, the Service cannot fairly be said to have fulfilled its obligation to "focus on the principal biological or physical constituent elements." The Service's pronouncement that "[a]reas that contain the physical and biological features that are essential to the conservation of this subspecies, identified as the subspecies' PCEs laid out in the appropriate quantity and spatial arrangement, are those areas capable of supporting a core population" (AR 26675) does not remedy this absence. As has already been indicated, since the FWS failed to give any explanation as to what the phrase "appropriate quantity and spatial arrangement" means, this statement is inadequate.

     In fact, by relying on core population as the ultimate metric for designating critical habitat, without giving any explanation as to the relationship between this metric and the SBKR's PCEs, the FWS made the PCEs logically insignificant to the critical habitat designation process. Using this methodology, the FWS could have nominally settled on any set of PCEs

14

without ever paying those constituent elements any heed.[6]  Adopting a methodology that

diminishes the significance of PCEs to this degree does not satisfy the kind of "focus" that 50

C.F.R. § 424.12 contemplates.  Since the FWS failed to follow its own regulation in determining

the SBKR's critical habitat, that determination must be set aside.

    C.   <u>The FWS's Decision Not to Designate Any Unoccupied Areas as Critical Habitat</u>

       A third ground for setting aside the 2008 revised final critical habitat designation is that

the FWS acted arbitrarily and capriciously when it decided not to set aside any areas not

occupied by the species as critical habitat.  In declining to set aside any unoccupied areas as

critical habitat, the Service stated,

> [W]e believe that conservation of this subspecies would be achieved if threats to
> this subspecies . . . were reduced or removed in the areas we identified as meeting
> the definition of critical habitat.  Therefore, consistent with the statutory
> obligations of the Act and our implementing regulations we are not designating
> any unoccupied areas or areas outside the geographical area occupied by this
> subspecies at the time it was listed.

AR 26686; *accord* AR 26665.  The final rule does not give any account of how the Service

decided that conservation could be achieved by focusing purely on areas occupied by the SBKR.

The final rule is silent as to what facts or analysis forms the basis of this belief, and as was

explained above, a court reviewing an agency action "may not infer an agency's reasoning from

mere silence." *Arrington*, 516 F.3d at 1112 (quotations omitted).  Since the Service failed to

demonstrate a "rational connection between the facts found and the choice made," the critical

---

[6] The administrative record suggests that consideration of PCEs was not completely irrelevant in this case.  The
FWS made site visits to designated areas to confirm that the SBKR's critical habitat actually contained the PCEs
listed above.  (AR 26686.)  However, this after-the-fact confirmation process cannot fairly be construed as the kind
of "focus" mentioned in the regulation; it is clear from the record and from Defense counsel's arguments that the
driving factor in determining the SBKR's critical habitat was not the presence of PCEs, but the existence of a core
population.

habitat designation is unsatisfactory. *Bonneville Power*, 477 F.3d at 687 (quoting *State Farm*, 463 U.S. at 43).[7]

D. Remedy

In their moving papers, Plaintiffs contend that the proper remedy in this case is for this Court to vacate the SBKR's final revised critical habitat designation and remand the matter to the FWS to issue a new critical habitat designation under an appropriate methodology. They further contend that, pending the promulgation of this new critical habitat designation, the 2002 critical habitat designation should be reinstated. Defendants do not object to this proposed remedy. Furthermore, since the 2002 designation was only displaced by virtue of the promulgation of the revised 2008 designation, it appears that vacating the 2008 designation should naturally cause the 2002 designation to come back into effect. For these reasons, the 2002 designation will be reinstated pending the FWS's consideration of a second revised final critical habitat.

IV. CONCLUSION

For the foregoing reasons, the 2008 revised final critical habitat designation for the San Bernardino Kangaroo Rat will be vacated, the 2002 final critical habitat designation will be reinstated, and this matter will be remanded to the FWS to consider a second revised final critical habitat designation. An order to that effect follows this opinion.

| January 8, 2011 | /s/ Anne E. Thompson |
|---|---|
| DATE | ANNE E. THOMPSON, U.S.D.J. |

---

[7] Plaintiffs also urge the Court to set aside the SBKR's final revised critical habitat rule for excluding, under Section 4(b) of the Act, certain specific areas that would otherwise meet the FWS's critical habitat criteria. In light of the Court's holding, it is not necessary to determine whether or not these exclusions were made properly.